**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,**
Appellant,

v.

**The RIGGS NATIONAL BANK OF WASHINGTON, D.C.,**
Appellee.

No. 94–7244.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 23, 1996.

Decided Aug. 27, 1996.

---

Edward G. Gallagher, Vienna, VA, argued the cause and filed the briefs, for appellant.

Eva P. Esber, argued the cause and filed the brief, for appellee. Karen L. Peck, Washington, DC, entered an appearance.

Before: EDWARDS, Chief Judge, GINSBURG and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

A check forger (identity unknown) collected $640,712.08 on 14 fraudulent checks drawn against an account of NHP Property Management, Inc. at The Riggs National Bank, leaving Riggs and NHP's insurer, National Union Fire Insurance Company, at odds over who must bear the loss. Riggs charged NHP's account, National Union reimbursed NHP in return for NHP's assignment of its claims arising from the loss, and National Union now wants the money back from Riggs.

After a bench trial the district court entered judgment in favor of Riggs based upon one of the two affirmative defenses that the Bank raised, to wit, the "superior equities" doctrine, and National Union appealed. We certified two questions of law to the District of Columbia Court of Appeals, 5 F.3d 554 (1993), which advised that the superior equities doctrine does not operate against an assignee or a conventional subrogee such as National Union, 646 A.2d 966 (D.C.1994). Based upon that answer we reversed and remanded the case to the district court with an instruction to rule on Riggs' alternative defense, which is that NHP implicitly agreed to bear the risk of the loss that occurred here.

On remand the district court again entered judgment in favor of Riggs. National Union now appeals from that judgment. We reverse and remand, this time with an instruction to the district court to enter judgment in favor of National Union.

## I. Background

In September 1982 Riggs Bank wrote as follows to E. Thomas Stoddard, an NHP vice president, confirming Riggs' receipt of signature cards for two NHP accounts:

It is our understanding from your letter that we are authorized to honor all checks ... bearing or purporting to bear the facsimile signature of E. Thomas Stoddard, R. Wayne Mosier and Robert K. Taylor.

Further, [Riggs] shall be entitled to honor and charge this company for all checks ... regardless of by whom or by what means the actual or purported facsimile signature thereon may have been affixed thereto, if such facsimile signature resembles the facsimile specimen from time to time filed with [Riggs].

About two weeks earlier NHP, acting through Stoddard, had indeed indicated its acceptance of these terms for one of the two accounts by executing a form ("Resolution for Facsimile Signatures") supplied by Riggs. In November 1982 and February 1983 NHP executed identical forms, thereby again accepting these terms for two other accounts at Riggs. In March 1983, NHP executed yet another such form in order to add a signatory on two NHP accounts.

None of these forms, however, referred to the account (No. 17–033–044) upon which the fraud in this case was committed. NHP did not open that account until November 1988, more than five years after last submitting a facsimile signature resolution. Riggs admits that NHP never executed a facsimile signature resolution for the relevant account and does not claim to have asked NHP to do so. Nonetheless, each month from December 1988 until May 14, 1990 Riggs honored more than 10,000 checks written against this account and bearing facsimile signatures, including 14 checks bearing the forged facsimile signature of Connie M. Hagen, NHP's Senior Vice President of Finance.

## II. Analysis

■ Unless varied by an agreement between them, the relationship between Riggs and NHP is governed by the terms of the Uniform Commercial Code (as adopted by the District of Columbia), which provides that "[n]o person is liable on an instrument unless his signature appears thereon." D.C.Code § 28:3–404(1). Riggs claims that NHP is liable for the amount the Bank paid on the 14 fraudulent checks, notwithstanding that NHP's signature does not appear thereon, because the parties had implicitly so agreed in their "course of dealing." *See* D.C.Code §§ 28:1–102(3), 1–201(3), 1–205(3) & 4–103(1). The district court found that there was such a course of dealing and that NHP had effectively agreed to accept the risk of loss due to forgeries such as the ones that occurred in this case.

We turn first to National Union's claim that the evidence is insufficient to support the court's finding and that Riggs' affirmative defense, the sole basis for a judgment in its favor, therefore fails. Because we agree with National Union that the evidence is not sufficient, we pass over the insurer's alternative claim that Riggs would be liable even under the terms of the Resolution for Facsimile Signatures, and proceed instead to National Union's claim for pre-judgment interest.

### A. Course of Dealing

The UCC defines a "course of dealing" as

a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

D.C.Code § 28:1–205(1). The district court found that the course of dealing between Riggs and NHP prior to May 1990, when Riggs paid on the fraudulent checks, reflects their agreement to shift from Riggs to NHP the risk of loss caused by forgeries such as occurred here. As the district court put it, by their course of dealing the parties "establish[ed] a common basis of understanding that NHP authorized Riggs to honor checks purporting to bear the facsimile signature of an NHP officer." We see in the record no evidentiary basis for that finding.

Each facsimile signature resolution executed by NHP concerns a specific account, and none of them concerns the account in which

the fraud occurred. Even considered in the aggregate, the resolutions are too few, and too closely clustered and far removed in time from the events relevant to this dispute to put NHP on notice that Riggs had a general policy concerning facsimile signatures that would govern Account 17–033–044. When the fraudulent checks written against this account passed through Riggs' signature-verification process, NHP had more than 50 accounts at Riggs including two of the three accounts for which NHP had executed facsimile signature resolutions in 1982 and 1983. In Account 17–033–044, opened in 1988, Riggs had been quite willing to honor approximately 180,000 checks bearing facsimile signatures without having received or even requested a facsimile signature resolution. Even if the course of dealing between Riggs and NHP in 1982 and 1983 might have put NHP on notice that it was acquiescing in a modification of its rights under the UCC when it opened Account 17–033–044 in 1988, Riggs' subsequent course of dealing would have been compelling evidence that either (1) Riggs' policy to this effect had changed since 1983 or (2) the policy never had been general.

Either inference would explain NHP's submission in May 1990—a few days before Riggs paid the first of the fraudulent checks—of a new signature card for Account 17–033–044 which, like the original, bore only holographic signatures. The district court gave no weight to this submission even though it is inconsistent with the court's finding that NHP knew that Riggs generally required execution of a facsimile signature resolution as a pre-requisite to the use of facsimile signatures.

Finally, the district court appears to have overlooked the testimony of Mary Lou Spottswood, NHP's Assistant Treasurer since 1984, that she had opened more than one account at Riggs on which NHP used facsimile signatures and that Riggs had never asked her either for an imprint of a facsimile or for a facsimile resolution. Riggs argues that the district court could properly have disregarded this testimony because Spottswood failed to identify those accounts precisely. Riggs does not claim to have asked her at trial, however, to identify the accounts and it now suggests no reason why the district court should nonetheless have discounted her testimony. Nor do we see the logic in Riggs' claim that Spottswood's testimony regarding accounts she opened "was seriously undermined" by her lack of familiarity with the facsimile signature resolutions that NHP had executed for accounts that she did not open.

In sum, the evidence does not support the district court's finding that NHP effectively agreed to depart from the terms of the UCC governing the risk of loss from checks bearing a forged drawer signature. The UCC therefore controls, and Riggs concedes that under the UCC, it loses.

## B. Pre-judgment Interest

Because the district court held Riggs not liable, that court had no occasion to rule upon National Union's claim for pre-judgment interest. National Union nevertheless asks us to determine whether it is entitled to pre-judgment interest as a matter of law. The law in question is D.C.Code § 15–108, which provides that

> In an action in the United States District Court for the District of Columbia ... to recover a liquidated debt on which interest is payable by contract or by law or usage the judgment for the plaintiff shall include interest on the principal debt from the time when it was due and payable, at the rate fixed by the contract, if any, until paid.

Riggs does not dispute that its debt to NHP is a liquidated debt. *See Hartford Accident and Indemnity Co. v. District of Columbia,* 441 A.2d 969, 974 (D.C.1982) ("A debt is liquidated if 'at the time it arose it was an easily ascertainable sum certain'"), quoting *Kiser v. Huge,* 517 F.2d 1237, 1251 (D.C.Cir. 1974).

Riggs asserts, however, that this court ought not to consider National's claim for pre-judgment interest because it depends upon factual issues left unresolved by the district court. The Bank, however, fails to identify a single disputed issue of material fact.

Riggs argues that National's claim to pre-judgment interest is precluded by the UCC which (at § 28:4–103(5)) provides that

> The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care. If there is also bad faith it includes any other damages the party suffered as a proximate consequence.

Riggs argues that this provision limits its liability to the face value of the fraudulent checks, i.e., without interest thereon, because the district court made no finding that the Bank acted in bad faith and the evidence of record does not support such a finding.

Riggs' argument is wide of the mark. National Union's claim for damages arises not from Riggs' failure to exercise ordinary care in honoring the fraudulent checks but from the Bank's breach of its contract of deposit (supplied by the UCC) in charging NHP's account for the amount that the Bank paid on those checks. The charges were not improper because Riggs was negligent—the district court found that Riggs was not—but because the UCC assigns to the Bank the risk of loss due to a forged drawer signature regardless of the care that the Bank exercised in handling the fraudulent item.

Finally, Riggs does not dispute that, if NHP had prosecuted this action and prevailed in its own right, then the appropriate rate for pre-judgment interest would be that specified in the "Sweep and Repurchase" agreement under which Riggs paid interest on the funds in Account 17–033–044. Nonetheless, Riggs argues that National Union, the depositor's subrogee, cannot recover this rate of interest for the entire pre-judgment period. Here is the Bank's reasoning: When National re-imbursed NHP for all but $10,000 of the amount that Riggs charged against the account, NHP deposited that sum back into the account on January 31, 1991, and Riggs has been paying interest on it ever since.

Reminded of a shell game? We are. Having paid the fraudulent checks, Riggs should have been out $640,712.08. Instead Riggs made itself whole by helping itself to $640,-712.08 from NHP's account and Riggs has had the use of those funds ever since. National Union made NHP whole in exchange for NHP's assignment of its claim against Riggs. After Riggs recovered $32,732.38 from the forger's bank account, the score was: Riggs, ahead more than $600,000; NHP, out the $10,000 deductible; National Union, out more than $600,000. Then NHP deposited at Riggs the proceeds of its insurance claim, in return for which Riggs paid NHP interest at the agreed rate. In other words, Riggs had the use of over $1.2 million but was paying NHP interest on only half that amount—not on the half that Riggs had improperly taken from the account and to which National Union now lays claim as NHP's subrogee.

National Union is entitled to interest on that sum at the rate that Riggs was contractually obliged to pay NHP. Riggs has stipulated that if National Union's entire claim for interest is sustained (as it is) then the correct figure for pre-judgment interest through November 30, 1994 is $100,196.17. Consistent with this stipulation, it remains for the district court only to calculate pre-judgment interest that has accrued since that date.

### III. Conclusion

For the reasons set out above, we vacate the judgment of the district court and remand this case to the district court with instructions to enter judgment in favor of National Union in the amount of $607,980 plus pre-judgment interest thereon.

*So ordered.*