# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 10, 2024      Decided August 19, 2025

No. 24-5011

MICHAEL HILL, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-01781)

———

*Andrea M. Seielstad* argued the cause for appellants. With her on the briefs was *Thomas E. Luebben*.

*Mary Gabrielle Sprague*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Todd Kim*, Assistant Attorney General, and *John L. Smeltzer*, Attorney.

Before: MILLETT and RAO, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: In the arid American West, conflicts frequently arise over water rights. This case concerns a dispute over such rights between the Crow (Apsáalooké) Tribe, the state of Montana, and the United States. After decades of negotiations and litigation, the dispute was resolved in the Crow Tribe-Montana Compact, which Congress ratified in 2010. Pursuant to the Crow Tribe Water Rights Settlement Act, the Tribe and tribal members who own reservation land held in trust by the United States waive any existing water rights in exchange for defined water rights and hundreds of millions of dollars in federal funds for water infrastructure projects.

Plaintiffs ("Allottees") own trust allotments on the Crow Reservation. Dissatisfied with the bargain struck by the Compact and the Settlement Act, and the representation they received in those negotiations, they seek to restore their previous water rights. In this suit, Allottees challenge the Secretary of the Interior's publication of a "Statement of Findings," upon which the Settlement Act and the waiver of their water rights became effective. Allottees allege the Secretary's action was in excess of statutory authority, breached the United States' trust obligations, and violated the Fifth Amendment. The district court dismissed Allottees' complaint for failure to state a claim. We affirm.

I.

A.

The water rights at issue here have a long history. For centuries, the Crow Tribe has inhabited a stretch of land that now includes the state of Montana. In 1868, the Tribe and the United States entered the second and final Treaty of Fort Laramie, which updated the borders of the Crow Indian Reservation along the Montana-Wyoming border. *See* Treaty with the Crow Indians art. II, May 7, 1868, 15 Stat. 649, 650.

Congress later allotted Reservation land to individual members of the Tribe, to be held in trust by the United States for twenty-five years. *See* General Allotment Act of 1887, ch. 119, § 5, 24 Stat. 388, 389; Crow Allotment Act of 1920, ch. 224, §§ 1, 13, 41 Stat. 751, 751, 756; *see also Montana v. United States*, 450 U.S. 544, 548 (1981). At the conclusion of twenty-five years, the United States was to convey to the allottees full title to the land "by patent … in fee," lifting the restrictions on alienation that encumbered the land while held in trust. General Allotment Act, § 5, 24 Stat. at 389; *see also* Crow Allotment Act, § 13, 41 Stat. at 756. Congress eventually ended the allotment system and provided that title to allotted land that had not yet passed out of trust was to be held indefinitely in trust by the United States on behalf of the allottees. Indian Reorganization Act of 1934, Pub. L. No. 73-383, § 1, 48 Stat. 984 (now codified at 25 U.S.C. § 5101); *see also United States v. Mitchell*, 445 U.S. 535, 540–41 (1980). Today, Crow Reservation land generally falls into three categories: land held in trust for the Tribe, land held in trust for individual allottees, and land owned in fee patent by Indians and non-Indians.

Before the 2010 Settlement Act, the Crow Tribe and individual allottees held reserved water rights dating to 1868, when the Crow Reservation was created. *See Winters v. United States*, 207 U.S. 564, 576–78 (1908); *United States v. Powers*, 305 U.S. 527, 532–33 (1939) (holding that the 1868 Treaty of Fort Laramie creating the Crow Reservation reserved tribal water "for the equal benefit of tribal members" such that when Reservation land was allotted to individual Indians, "the right to use some portion of tribal waters essential for cultivation passed to the owners"). These so-called *Winters* rights are treated as having taken effect on the date the reservation was established and therefore are senior in priority to any water rights accruing after 1868. *See Cappaert v. United States*, 426 U.S. 128, 138 (1976).

Faced with increasing water scarcity, the Crow Tribe has been part of ongoing disputes with Montana and the federal government over its water rights. In 1975, the United States filed a lawsuit on the Crow Tribe's behalf to determine the Tribe's water rights. *United States v. Big Horn Low Line Canal Company*, No. 75-cv-34 (D. Mont., filed April 17, 1975); *see also* Mont. Code Ann. § 85-20-901 (1999) (recounting litigation history). Over the next two decades, the Crow Tribe, Montana, and the United States negotiated over the water rights of the Tribe and individual allottees, with the United States representing the allottees as trustee.

The parties agreed to the Crow Tribe-Montana Compact in 1999. *See* Mont. Code Ann. § 85-20-901 ("Compact"). The Compact sets forth a "Tribal Water Right," which includes the right of the Tribe and individual allottees to divert, use, and store water from sources on the Reservation. *Id.* art. II, § 30; art. III. The Secretary of the Interior is charged with administering and enforcing the Tribal Water Right until the Tribe develops a "Tribal [W]ater [C]ode." *Id.* art. IV, § A.2.b. The Compact also requires the Tribe's Water Resources Department and the United States to provide Montana "a report listing all current uses of the Tribal Water Right" within one year of the Compact's ratification by the Montana legislature. *Id.* art. IV, § E.2 ("Current Use List").

In 2010, Congress ratified the Compact in the Crow Tribe Water Rights Settlement Act. *See* Pub. L. No. 111-291, 124 Stat. 3097 ("Settlement Act"). The Settlement Act codifies the tribal water rights established in the Compact, which are to "be held in trust by the United States for the use and benefit of the Tribe and the allottees." *Id.* § 403(c)(1); *see also id.* §§ 403(17), 407(b). Under the Act, allottees are "entitled to a just and equitable allocation of water for irrigation purposes," to "be satisfied from the tribal water rights" pursuant to the

Tribal Water Code. *Id.* § 407(d)(2)–(3), (f). In exchange for these codified rights and hundreds of millions of dollars in federal funding for tribal water projects, the Tribe and allottees agreed to release all other water rights claims. *Id.* §§ 405, 406, 409(a), 410, 414.

Waiver of prior water rights is effectuated when the Secretary of Interior publishes a "[S]tatement of [F]indings" certifying that seven statutory conditions have been met. *Id.* § 410(b), (e). The Settlement Act provides for its automatic repeal should the Secretary fail to publish its Statement of Findings by March 31, 2016, or by an "extended date agreed to by the Tribe and the Secretary." *Id.* § 415.

On March 21, 2016, the Tribal Chairman of the Crow Tribe agreed to extend the deadline for three months. The Secretary published the Statement of Findings within the agreed to deadline extension. 81 Fed. Reg. 40,720 (June 22, 2016).

## B.

Nearly six years after the Secretary published the Statement of Findings, Allottees filed this suit against the United States. Allottees are Crow Tribe members whose land is held in trust by the United States, members who own former trust allotments in fee patent, and an association that represents Crow trust allotment landowners. As relevant to this appeal, Allottees alleged the Government acted in excess of statutory authority by publishing the Statement of Findings after the statutory deadline, breached trust duties owed to Allottees, and violated the Fifth Amendment. They sought declaratory relief stating that the publication of the Statement of Findings was void and that the Settlement Act was automatically repealed.

6

The district court concluded none of Allottees' allegations stated a claim for which relief could be granted and dismissed the complaint. Allottees timely appealed.

II.

We have jurisdiction under 28 U.S.C. § 1331. To withstand a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). We review de novo the district court's dismissal of the complaint for failure to state a claim. *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1135 (D.C. Cir. 2023). "At this stage, we construe the complaint liberally, granting [Allottees] the benefit of all inferences that can be derived from the facts alleged." *Id.* (cleaned up).

III.

Allottees first claim the Settlement Act never went into effect because the Statement of Findings was published after the Act's deadline had passed. Although the Secretary and the Tribal Chairman had agreed to extend the statutory deadline, Allottees contend that the Tribal Chairman lacked authority to agree to the extension. Allottees maintain there was no valid extension "agreed to by the Tribe and the Secretary" as required by the Act, and so the Secretary's publication was without legal effect and the Act was automatically repealed on March 31, 2016. Settlement Act, § 415, 124 Stat. at 3121.

Because the Settlement Act does not provide a private cause of action, we construe this claim as an allegation that, by publishing the Statement of Findings after the deadline, the Secretary acted in excess of statutory authority in violation of the Administrative Procedure Act. *See* 5 U.S.C. § 706(2);

*Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 n.4 (1986) (explaining that in the absence of a private cause of action in the statute, plaintiffs "may avail themselves of the right of action created by the APA" unless "clear and convincing evidence" demonstrates a "legislative intention to preclude review").

A.

As a threshold matter, we find that the complaint challenges final agency action reviewable under the APA. 5 U.S.C. § 704 (providing for judicial review of "final agency action for which there is no other adequate remedy in a court"). For purposes of the APA, agency action is final when it "mark[s] the consummation of the agency's decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).

Allottees' complaint challenges the validity of the Statement of Findings, not just the deadline extension as the Government contends. The complaint states, for instance, that the Settlement Act "was automatically repealed, effective the day after the deadline, because the Secretary *did not lawfully publish the Statement of Findings* 'not later than March 31, 2016, or the extended date agreed to by the Tribe and the Secretary.'" Amend. Compl. ¶ 148 (emphasis added). Moreover, in the prayer for relief, the complaint requests a declaratory judgment "that the Secretary's publication in the Federal Register of the Enforceability Date of the 2010 Crow Tribe Water Rights Settlement Act is void and unenforceable." *Id.* ¶ A. Construed liberally, the complaint is fairly read as arguing the Statement of Findings is invalid because it was issued after the statutory deadline.

As the parties agree, the Statement of Findings constitutes final agency action. It is the completion of the Secretary's statutory obligation under the Settlement Act, and it alters Allottees' legal rights by triggering the waiver of their *Winters* rights. *Bennett*, 520 U.S. at 177–78. Allottees challenge the validity of the Statement of Findings, which is a final agency action amenable to judicial review under the APA.

## B.

Allottees maintain the Secretary had no authority to publish the Statement of Findings three months after the statutory deadline because the Tribal Chairman lacked authority to agree to a deadline extension on behalf of the Tribe. The Settlement Act requires the Secretary to publish the Statement of Findings "not later than March 31, 2016, or the extended date agreed to by the Tribe and the Secretary." Settlement Act, § 415, 124 Stat. at 3121. If no Statement is published by this date, or an agreed upon extended date, then the Act is automatically repealed. *Id.* According to Allottees, the Crow Constitution vests the authority to extend this deadline exclusively with the Crow Tribal General Council[1] and the Crow Legislature. Allottees contend there was no valid extension agreement between the Secretary and "the Tribe," and therefore the Secretary's publication of the Statement of Findings three months after the statutory deadline was without force of law, and the Act was automatically repealed.

When reviewing the federal government's decision to negotiate or enter into agreements with Indian tribes, "we owe

---

[1] The General Council is the "governing body of the Crow Tribe" and sits above all three branches of the Crow government established in the Crow Constitution. Const. and Bylaws of the Crow Tribe of Indians art. I. The Council is comprised of all adult Tribe members eligible to vote. *Id.*

deference to the judgment of the Executive Branch as to who represents a tribe." *Timbisha Shoshone Tribe v. Salazar*, 678 F.3d 935, 938 (D.C. Cir. 2012). The federal courts have long acknowledged that in matters of tribal recognition, courts "follow the action of the executive and other political departments …, whose more special duty it is to determine such affairs." *United States v. Holliday*, 70 U.S. (3 Wall.) 407, 419 (1866). And by statute, the Secretary of the Interior "has the power to manage '*all* Indian affairs and [] *all* matters *arising out of Indian relations*.'" *California Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1267 (D.C. Cir. 2008) (quoting 25 U.S.C. § 2) (alterations in original). As such, when disputes arise as to which entity represents a tribe, we will uphold the Secretary's interpretation of tribal law to determine who represents the tribe so long as that interpretation is reasonable. *See Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 12–13 (D.D.C. 2019) (upholding as "reasonable" the federal government's conclusion that, under tribal law, one faction was the tribal governing body for purposes of federal contracting).

We conclude the Secretary reasonably determined that the Tribal Chairman's consent was sufficient to extend the deadline for publishing the Statement of Findings. The Settlement Act does not specify which tribal entity or representative may represent the Tribe in agreeing to a deadline extension. Instead, the Act defines the "Tribe" merely as "the Crow Tribe of Indians of the State of Montana on behalf of itself and its members (but not its members in their capacities as allottees)." Settlement Act, § 403(18), 124 Stat. at 3099. Under the Crow Constitution, the Tribal Chairman is the head of the Crow Tribe's Executive Branch, which is vested with broad authority to "represent the Crow Tribe of Indians in negotiation with Federal, State and local governments and other agencies … in matters of welfare, education, recreation, social services and economic development." Const. and

Bylaws of the Crow Tribe of Indians art. IV, § 3(a). While the Statement of Findings has important legal consequences, agreement to the deadline extension did not alter these legal consequences or substantively affect the Crow's rights, and so was a purely ministerial act between the Secretary and the Tribe.

Given the terms of the Act and the allocation of authority under the Crow Constitution, it was entirely reasonable for the Secretary to conclude that an agreement to extend the deadline for publishing the Statement of Findings falls within the Chairman's broad grant of authority to represent the Tribe in negotiations with the federal government.

## C.

Allottees raise several arguments to rebut this straightforward conclusion, but none undermine the reasonableness of the Secretary's determination that the Tribal Chairman could provide the necessary consent for the deadline extension.

Allottees do not allege that the Chairman is not the legitimate head of the Tribe's Executive Branch. Instead, they claim that under the Crow Constitution, authority to agree to an extension resides exclusively with the Crow Tribal General Council and the Tribal Legislature, not the Chairman. Allottees point out that the Crow Constitution gives the Legislative Branch the power "to grant final approval or disapproval of items negotiated by the Executive Branch … pertinent to the sale, disposition, lease or encumbrance of Tribal lands, interests in lands or mineral assets." Const. and Bylaws of the Crow Tribe of Indians art. V, § 2(d). This provision, however, does not speak to the authority of the Tribal Chairman to agree to a ministerial matter with the representative of another sovereign. In agreeing to a deadline extension for the Statement

of Findings, the Chairman was not agreeing to any substantive disposition of the Tribe's rights, which were already settled by the Compact.

Allottees next argue a resolution by the Tribal Legislature settles the question of the Tribal Chairman's authority.[2] In 2012, after the Settlement Act was enacted, but before publication of the Statement of Findings, the Tribal Chairman signed a document purporting to waive all claims to water not provided for in the Settlement Act. The Crow Legislature passed a resolution in protest that stated: "[N]o future waivers or releases of Crow tribal claims shall be authorized … when signed by a single Crow tribal member, even if the Executive Branch Chairman, unless specific Crow tribal constitutional or tribal statutory authority can be cited." J.A. 69. According to Allottees, this resolution should have put the Government "on clear notice" that the Chairman could not unilaterally agree to the deadline extension. But the resolution does not apply here, because the deadline extension does not "waive or release" any Tribal claims. Rather, the Chairman merely effectuated the Settlement Act when he agreed to extend the deadline for the Secretary to take a specific action required by the Settlement Act.

---

[2] Allottees gesture at a second statute by the Tribal Legislature, which they maintain sheds light on the Tribal Chairman's lack of authority. But that statute simply "establish[es] and affirm[s] … the lawful procedure for" ratification votes, including for the Compact and the Settlement Act. CLB No. 2011-03, Preamble. This statute specifies that ratification votes are only for "federal or Crow tribal law which *requires* a majority vote of the Crow tribal membership." *Id.* at § 3(a) (emphasis added). A ratification vote already occurred for the Compact and Settlement Act, and CLB No. 2011-03 nowhere suggests that every act effectuating an already ratified statute requires yet another ratification vote.

Allottees do not identify any source of Crow legal authority that undermines the Secretary's reasonable conclusion that the Chairman, the head of the Crow Executive Branch, had authority to agree to an extension for publishing the Statement of Findings. Because Allottees have not plausibly alleged the extension was invalid, they have not stated a claim that the Statement of Findings was published without statutory authority.

## IV.

Allottees next claim that the Secretary's publication of the Statement of Findings breached the Government's trust duties to protect their *Winters* rights. To maintain a breach of trust claim against the United States, Allottees must (1) identify a source of law creating specific fiduciary duties for the Government, and (2) plausibly allege "that the Government has failed faithfully to perform those duties." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003). Although the Settlement Act creates trust duties, Allottees have failed to plausibly allege the Government violated any specific duty.

## A.

While there exists "a general trust relationship between the United States and the Indian people," this "bare" trust relationship does not create legally enforceable fiduciary responsibilities. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 173–77 (2011) (cleaned up). Rather, because the United States is a sovereign, it "assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities" in some positive law source. *Id.* at 177. Only specific trust obligations established by "the text of a treaty, statute, or regulation" may be judicially enforced against the United States government. *Arizona v. Navajo Nation*, 143 S. Ct. 1804, 1813 (2023). To create an enforceable fiduciary

duty, a law must establish specific government responsibilities or the government must otherwise "assume[] … elaborate control" over the trust assets. *United States v. Mitchell*, 463 U.S. 206, 222, 225 (1983); *see also United States v. White Mountain Apache Tribe*, 537 U.S. 465, 474–75 (2003).

The Settlement Act creates specific trust duties for the Government. The Act contains express fiduciary language and identifies the Tribe and allottees as beneficiaries, providing that "[t]he tribal water rights (1) shall be held in trust by the United States for the use and benefit of the Tribe and the allottees in accordance with this section; and (2) shall not be subject to forfeiture or abandonment." Settlement Act, § 407(c), 124 Stat. at 3104. Moreover, the Act imposes several discrete responsibilities on the United States. The Secretary is charged with helping to carry out the "Rehabilitation and Improvement of Crow Irrigation Project," designing and constructing features of the comprehensive water system, protecting the water rights of allottees, administering the tribal water right until the Tribal Water Code is enacted, and administering the "Crow Settlement Fund." *Id.* §§ 405–07, 411, 124 Stat. at 3100–06, 3113. These specific duties suffice to establish a trust relationship.

## B.

Although the Settlement Act establishes certain fiduciary duties, Allottees fail to state a claim for breach of trust because they do not plausibly allege the Government breached any duty established by the Act. The complaint alleges the Statement of Findings could not be published before the promulgation of a Current Use List and Tribal Water Code. Allottees contend they have lost their valuable *Winters* rights but have not yet received any clearly defined water rights in their place. The Government has thus breached its fiduciary duties, placing

Allottees' "water rights in limbo" and reducing their market value.

But the Settlement Act does not impose a duty on the United States to ensure the Current Use List and Tribal Water Code are completed before the Secretary publishes the Statement of Findings. The Act directs the Secretary to confirm that seven specific conditions have been satisfied and then publish those findings in the Federal Register.[3] *See* Settlement Act, § 410(e), 124 Stat. at 3112. None of these seven conditions includes the preparation of the Current Use List or enactment of the Tribal Water Code.

Finding that the seven statutory conditions were met, the Secretary published the required Statement. Allottees have not

---

[3] The Secretary must publish "a statement of findings that (A)(i) the Montana Water Court has issued a final judgment and decree approving the Compact; or (ii) if the Montana Water Court is found to lack jurisdiction, the district court of jurisdiction has approved the Compact as a consent decree and such approval is final; (B) all of the funds made available under subsections (c) through (f) of section 414 have been deposited in the Fund; (C) the Secretary has executed the agreements with the Tribe required by sections 405(a) and 406(a); (D) the State of Montana has appropriated and paid into an interest-bearing escrow account any payments due as of the date of enactment of this Act to the Tribe under the Compact; (E)(i) the Tribe has ratified the Compact by submitting this title and the Compact to a vote by the tribal membership for approval or disapproval; and (ii) the tribal membership has voted to approve this title and the Compact by a majority of votes cast on the day of the vote, as certified by the Secretary and the Tribe; (F) the Secretary has fulfilled the requirements of section 408(a); and (G) the waivers and releases authorized and set forth in subsection (a) have been executed by the Tribe and the Secretary." Settlement Act, § 410(e), 124 Stat. at 3112.

plausibly alleged that this was a breach of any fiduciary duty established by the Act.[4]

## V.

Finally, we consider Allottees' allegations that the Secretary's publication of the Statement of Findings violated their Fifth Amendment rights. Here, too, we conclude that Allottees have failed to state a claim.

## A.

Allottees first contend that the publication of the Statement of Findings was an unconstitutional taking of their water rights. Allottees urge this court to read their complaint as stating a claim under the Takings Clause. We are skeptical that the complaint's stray references to "expropriation" suffice to assert a takings claim. But we need not dwell on that issue because even assuming the complaint adequately alleges a taking, Allottees have expressly waived any claims for damages and have not attempted to justify their request for "declaratory and equitable relief." Appellant Br. 34.

The Takings Clause of the Fifth Amendment provides that no "private property" may "be taken for public use, without just compensation." U.S. Const. amend. V. A taking may occur when the government "physically acquires private property for a public use," or when the government "imposes regulations that restrict an owner's ability to use his own property." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021).

---

[4] Allottees also allege the Secretary's publication of the Statement of Findings without first ensuring the publication of a Current Use List and promulgation of a Tribal Water Code violated the APA. Because this argument is a repackaging of Plaintiffs' breach of trust claims, we similarly reject it.

The presumptive remedy for an alleged federal taking is monetary relief. Under the Tucker Act, an individual who claims the United States has taken his property may seek compensation in the Court of Federal Claims. *See* 28 U.S.C. § 1491(a)(1). "The Tucker Act … provides the standard procedure for bringing [Fifth Amendment takings] claims." *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2170 (2019).

Because monetary compensation under the Tucker Act will generally provide an adequate remedy at law, equitable relief typically is not available for takings claims. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) (holding "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking"). The Supreme Court recently reiterated that because the federal government "provide[s] just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable. As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Knick*, 139 S. Ct. at 2176.

"Declaratory relief, like other forms of equitable relief, is discretionary." *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1019 (D.C. Cir. 1991). And when declaratory relief functions like an injunction, a plaintiff must plausibly allege that equitable relief is justified. *See Samuels v. Mackell*, 401 U.S. 66, 68–74 (1971) (analyzing request for declaratory relief under "the same equitable principles relevant to the propriety of an injunction" because "[o]rdinarily … the practical effect of the two forms of relief will be virtually identical").

The Allottees are clearly pursuing equitable remedies. In opposing the motion to dismiss, Allottees stated that their complaint "does not seek compensation for a taking" but rather "seeks to preserve the Allottees' uniquely valuable *Winters* water rights." On appeal, Allottees describe their takings claim as seeking a declaration "voiding" the Statement of Findings, "thereby honoring the repeal of the Act" and restoring Allottees' *Winters* rights. Appellant Br. 39. The declaration they seek would function as an injunction and therefore must be assessed by equitable standards.

Because Allottees seek equitable relief for their takings claim, they were required to make at least some argument as to why remedies at law would be inadequate to compensate them. To the extent a plaintiff can ever seek equitable relief for a taking by the federal government, we have suggested this remedy is available only if "the monetary compensation available through the Tucker Act remedy is so inadequate that the plaintiff would not be justly compensated for the seizure of his property by the United States." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 613 (D.C. Cir. 1992). *But cf. Knick*, 139 S. Ct. at 2173 ("Equitable relief was not available because monetary relief was under the Tucker Act."). We need not decide whether the narrow exception described in *Transohio* survives the Supreme Court's decision in *Knick* because nothing in the Allottees' complaint or their opposition to the motion to dismiss even suggests that compensation would be an inadequate remedy.[5] Allottees' takings claim therefore fails as a matter of law.

---

[5] Allottees maintain the Supreme Court recognized the availability of declaratory and equitable relief for takings of Indian property rights in *Hodel v. Irving*, 481 U.S. 704 (1987), and *Babbitt v. Youpee*, 519 U.S. 234 (1997). *Hodel* and *Babbitt*, however, do not squarely address the question of remedies, and in any event nowhere suggest

18

B.

Allottees also allege that publication of the Statement of Findings violated their Fifth Amendment right to due process.

The Due Process Clause of the Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. To assert a due process claim, a plaintiff must allege that the government has deprived him of a protected property interest and that the procedures used by the government were constitutionally deficient. *See Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 459–60 (1989). "[A] procedural due process claim requires the plaintiff to identify the process that is due." *Doe by Fein v. District of Columbia*, 93 F.3d 861, 870 (D.C. Cir. 1996) (per curiam).

If a property deprivation is "the direct consequence" of a statute, and there is no alleged "defect in the legislative process," there is "no basis" for a procedural due process claim.[6] *Atkins v. Parker*, 472 U.S. 115, 130 (1985). When Congress enacts "[g]eneral statutes within the state power … that affect the person or property of individuals," there is no entitlement to notice or an opportunity to be heard. *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915).

---

that such equitable remedies are available without a showing that compensation is inadequate. *See Knick*, 139 S. Ct. at 2176.

[6] By contrast, when the government makes individualized determinations about property rights, the holders of those rights are generally entitled to procedures, such as notice and an opportunity to be heard before a neutral decisionmaker. *See Londoner v. City and Cnty. of Denver*, 210 U.S. 373, 385–86 (1908). There is no individualized determination or adjudication at issue here.

The complaint alleges the publication of the Statement of Findings deprived Allottees of their valuable *Winters* rights without due process. The Government does not contest that Allottees have alleged a deprivation of a protected property interest. Allottees have failed, however, to plausibly allege that the process they received was constitutionally defective.

The complaint states only that Allottees were deprived of their *Winters* water rights "without notice or due process of law." Compl. ¶ 213. But the Settlement Act provided notice to Allottees that the waivers of their *Winters* rights would be effective once the Secretary published the Statement of Findings. We agree with the district court that "the legislative process was the only process to which [Allottees] were entitled." *Hill v. U.S. Dep't of the Interior*, 699 F. Supp. 3d 1, 28–29 (D.D.C. 2023) (cleaned up). The Statement of Findings was not an adjudication or administrative determination of Allottees' *Winters* water rights. Rather, the Statement was published as the "direct consequence" of a duly enacted statute—literally the due process of a law. *Atkins*, 472 U.S. at 130. And Allottees do not allege any defects in the legislative process resulting in the Settlement Act. *Id.* Therefore, "the legislative determination provides all the process that is due." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982).

Moreover, the complaint identifies no additional notice to which Allottees were entitled. *Doe by Fein*, 93 F.3d at 870. On appeal, Allottees raise arguments that the Government was required to provide them with some type of personal service and a hearing before publication of the Statement of Findings. But these claims are new on appeal and therefore forfeited. Allottees have failed to state a due process claim.

C.

Finally, we consider Allottees' claim that publication of the Statement of Findings violated the Fifth Amendment's equal protection guarantee.

The Supreme Court has long held that the Fifth Amendment's Due Process Clause incorporates equal protection principles. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975). The equal protection guarantee means that "laws that classify on the basis of race, alienage, or national origin trigger strict scrutiny and will pass constitutional muster only if they are suitably tailored to serve a compelling state interest." *United States v. Skrmetti*, 145 S. Ct. 1816, 1828 (2025) (cleaned up). Laws that distinguish between Indians and non-Indians are not generally subject to strict scrutiny if the distinction is based on Indians' status "as members of quasi-sovereign tribal entities," and "can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians." *Morton v. Mancari*, 417 U.S. 535, 554–55 (1974).

Allottees claim that the Statement of Findings, by triggering the Settlement Act's waiver of their *Winters* water rights, impermissibly distinguishes between Indian and non-Indian water rights holders.[7] In particular, the complaint alleges the Act, once it goes into effect, will benefit non-Indian water users by protecting them from Indian priority calls, which, absent the Act, would date back to 1868.

This claim fails out of the gate. The Settlement Act does not differentiate between Indians and non-Indians, but rather

---

[7] As to Allottees' argument that their equal protection claim alleges impingement of a fundamental right, water access, this allegation is new on appeal and therefore forfeited.

between property types. Under the Act, the Tribe and allottees waive their *Winters* water rights in exchange for the benefits and water rights conferred in the Act. Settlement Act, § 410(a)(2), 124 Stat. at 3109. By contrast, the water rights of individuals who own fee patented land on the Reservation are determined by Montana state law and are unaffected by the terms of the Settlement Act and the Compact. *See, e.g.*, Mont. Code Ann. § 85-20-901, art. II, § 19; art. III; art. IV, § A.2.c. The categories drawn in the Compact and ratified in the Settlement Act are thus threefold: the Tribe, allottees, and fee patent landowners. But these categories do not map onto tribal status. While all allottees are tribal members, many of the fee patent owners are *also* tribal members. Even if the Act benefits fee patent holders over allottees, that distinction does not turn on whether the property holders are Indians because Indians own both types of property. Allottees therefore fail to state an equal protection claim under the Fifth Amendment.

* * *

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*